**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Gregg RODGERS, Appellee.**

Superior Court of Pennsylvania.

Argued Sept. 20, 2005.

Filed April 21, 2006.

Christopher D. Carusone, Asst. Dist. Atty., Harrisburg, for Com., appellant.

Gary B. Zimmerman, Pittsburgh, for appellee.

BEFORE: ORIE MELVIN, McCAFFERY, and POPOVICH, JJ.

OPINION BY McCAFFERY, J.:

¶ 1 In this appeal, the Commonwealth asks us to determine whether the trial court erred in granting a defense motion to suppress physical evidence seized by law enforcement officers in California pursuant to a search warrant issued there which was based in part upon information obtained by Pennsylvania law enforcement officers from intercepted telephone conversations. The trial court concluded that the Commonwealth had failed to provide probable cause for the issuance of the order authorizing the non-consensual interception because the Commonwealth had not shown that normal investigative procedures had been tried and failed, or were likely to fail, or were too dangerous to

employ, a prerequisite for non-consensual interception under 18 Pa.C.S.A. § 5710(a)(3). Upon review of the record and analysis of the pertinent statutory and decisional law, we conclude that the trial court erred in granting the motion to suppress, and, accordingly, we reverse and remand.

¶ 2 On August 6, 2001, the Honorable Maureen Lally–Green of this Court, upon application of the Attorney General of Pennsylvania, signed an order authorizing the non-consensual interception of wire communications of Appellee, Gregg Rodgers, and other individuals, both known and unknown, to and from the telephone number, 412–680–3729, utilized by Appellee. The order specified that the wire communications which could be intercepted were those concerning offenses involving possession and distribution of controlled substances and conspiracy.

¶ 3 In support of the application, the Attorney General attached the seventy-paragraph affidavit of Robert Iuzzolino, a narcotics agent employed by the Office of the Attorney General, and of Peter Grbach, a detective in the organized crime and narcotics unit of the Pittsburgh Police Department. Agent Iuzzolino and Detective Grbach described the ongoing investigation which had commenced in June 2000 and which had already resulted in the issuance of a prior order authorizing interception of wire communications from the telephone utilized by one of the other participants in the offenses, Glenn E. Ford, II. The affidavit included sections pertaining to 1) asynopsis of the investigation; 2) criminal history information; 3) development of the evidence; 4) pen register/trap and trace analysis; 5) the need for interception; and 6) the relief requested. The synopsis of the investigation was described as follows:

5. This investigation began in June 2000 when agents from the Organized Crime Section began buying cocaine from an individual who is hereinafter referred to as "CI# 1". An approximate total of three ounces of cocaine was purchased from CI# 1. In December 2000, Agent Iuzzolino approached CI# 1 and informed him of the cocaine purchases. CI# 1 agreed to cooperate with law enforcement. He identified Glenn E. Ford II (known to CI# 1 as "G. Ford") as the source of the cocaine he previously sold to the Office of Attorney General. CI# 1 stated that he has known Ford for about one and one half years and had been purchasing cocaine from him for that same period of time, contacting him by telephone to arrange drug purchases. CI# 1, in cooperation with law enforcement, has made several cocaine purchases from Ford, each one between three to four ounces.

On July 16, 2001, an Order, docketed at No. Misc. 12–7 W.D.2001, was entered by the Honorable Maureen Lally–Green of the Superior Court of Pennsylvania authorizing nonconsensual electronic surveillance of the telephone utilized by Glenn E. Ford II (412–481–3510). Conversations between Ford and [Appellee] and others which were intercepted during the course of this surveillance reveal that [Appellee] is supplying Ford and others with cocaine. [Appellee] has been intercepted repeatedly urging Ford to obtain "customers" to purchase large quantities of cocaine. Additionally, [Appellee] has introduced Ford to couriers which were identified as having brought multiple kilograms of cocaine from the "Mexican cartel" in California to Penn-

sylvania. Finally, Ford was intercepted in a conversation stating that he had met [Appellee's] "main" connection from California. From these communications and the evidence developed so far in this investigation, we believe that [Appellee], in conjunction with his cocaine sources in California, is attempting to establish a cocaine distribution network in and around the Allegheny County area.

Based on our training and experience and the evidence which has been collected to date, it is our belief that [Appellee] is engaged in cocaine distribution. Based on conversations between Ford and [Appellee] and others which have been intercepted during the course of the nonconsensual electronic surveillance of Ford's telephone, it is our belief that [Appellee] has access to a large source of cocaine. Although this investigation has been ongoing for many months and has included every investigative technique available to law enforcement (including nonconsensual electronic surveillance), we have not been able to identify [Appellee's] cocaine supplier, associates in addition to Ford, or other customers of [Appellee].

6. The purpose of the investigation and the requested interceptions is to identify and gather evidence concerning the details of [Appellee's] illegal activities, including the dates, times and places of drug transactions that are going to occur as well as other information concerning the ongoing criminal conspiracy, and the identification of other distributors of controlled substances working within the same network as [Appellee]. . . .

(Affidavit in Support of Application, ("affidavit"), dated August 3, 2001).

¶ 4 The affidavit contains forty-three numbered paragraphs which detail the development of the evidence, commencing with activities undertaken in December 2000, utilizing CI# 1 to purchase *cocaine* from Ford (*Id.* at paragraphs nine through fourteen); issuance of orders in February 2001, authorizing the Commonwealth's interception of calls and access to subscriber and telephone toll records of two telephones utilized by Ford (*Id.* at paragraphs fifteen and sixteen); continued purchases of cocaine by CI# 1 from Ford in February 2001 (*Id.* at paragraphs seventeen through nineteen); issuance of an order in March 2001, authorizing the installation of a pen register/trap and trace device on a telephone utilized by Ford (*Id.* at paragraph twenty); continued purchases of cocaine by CI# 1 from Ford in May, June, and July 2001 (*Id.* at paragraphs twenty-one through twenty-nine); issuance of the order on July 16, 2001, by Judge Lally–Green authorizing the non-consensual electronic surveillance of a telephone number, 412–481–3510, utilized by Glenn Ford (*Id.* at paragraph thirty); summaries of intercepted telephone calls during the period July 16 through July 31, 2001 (*Id.* at paragraphs thirty-one through fifty); issuance of an order on July 31, 2001, authorizing the installation of a pen register/trap and trace device on the telephone number, 412–680–3729, utilized by Appellee (*Id.* at paragraph fifty-one). The affidavit also contains summaries of call records for both a prior telephone number utilized by Appellee, 412–818–6751, and for 412–680–3729, obtained through use of pen register/trap and trace devices for the period April 25, 2001, and July 30, 2001 (*Id.* at paragraphs fifty-two through fifty-seven).

¶ 5 Of particular note are calls between Appellee and Ford that were intercepted pursuant to the July 16th order authoriz-

ing the non-consensual electronic surveillance of Ford's telephone number 412–481–3510. On July 18, 2001, a call was placed from 412–481–3510, utilized by Ford, to 412–818–6751, utilized by Appellee, which was interpreted by the affiants as Ford telling Appellee that one of his customers may purchase a quarter- or half-kilo of cocaine on the following day, and Ford berating Appellee for taking too long in renewing his supply of cocaine. (*Id.* at paragraph thirty-four). Later on July 18th, during a call placed from 412–680–3729, utilized by Appellee, Ford tells Appellee that the customer may still purchase cocaine from them on the following day. Appellee told Ford that his suppliers were leaving on the following day. (*Id.* at paragraph thirty-five).

¶ 6 On July 19, 2001, three calls were placed from 412–481–3510, utilized by Ford, to 412–818–6751, utilized by Appellee. During these calls, Ford told Appellee that he had just set up a drug sale for half a kilo of cocaine, but that the drugs would have to be delivered to the buyer. Appellee did not want to deliver the drugs and refused to complete the sale. Ford and Appellee argued about the price at which to sell a half-kilo of cocaine. (*Id.* at paragraphs thirty-nine through forty-one).

¶ 7 On July 20, 2001, a call was placed to 412–481–3510, utilized by Ford, in which Ford told Appellee that the customer had purchased cocaine elsewhere, and Appellee told Ford that he would try to give him a better price in the future. (*Id.* at paragraph forty-three). On July 24, 2001, a call was placed to 412–481–3510, utilized by Ford, in which Appellee told Ford that he had a new telephone number and that Ford should get it from his caller ID. (*Id.* at paragraph forty-five). On July 25, 2001, a call was placed from 412–680–3729, uti-

lized by Appellee, to 412–481–3510, utilized by Ford, in which Appellee told Ford to arrange a drug sale, and that he would sell a half-kilo of cocaine for $13,000. Appellee gave Ford his new telephone number because he had disposed of the old telephone. (*Id.* at paragraph forty-six). On July 26, 2001, a call was placed from 412–680–3729, utilized by Appellee, to 412–481–3510, utilized by Ford, in which Ford and Appellee discussed the prices for a half-kilo and a full kilo of cocaine. (*Id.* at paragraph forty-seven). On July 30, 2001, a call was placed from 412–481–3510, utilized by Ford, to 412–680–3729, utilized by Appellee, in which Appellee told Ford to see an associate about buying cocaine since he (Appellee) had left the Allegheny County area. (*Id.* at paragraph forty-eight).

¶ 8 On July 31, 2001, the Honorable W. Terrence O'Brien of the Court of Common Pleas of Allegheny County issued an order authorizing the installation and use of a pen register and trap and trace device on 412–680–3729, utilized by Appellee. Cell site location information generated by the pen register showed that Appellee's mobile telephone was activated and was contacting cellular towers located in Nebraska, Utah, and California. On August 1st, Appellee's telephone had contacted a cellular tower in Sacramento, California. (*Id.* at paragraph fifty-one).

¶ 9 Under a separate heading in the affidavit entitled "Pen Register/Trap and Trace Analysis", the affiants examine calls involving Appellee's two telephone numbers, 412–818–6751 and 412–680–3729, for the period from April 25, 2001, through July 30, 2001. (*Id.* at paragraphs fifty-two through fifty-seven). In the opinion of the affiants, the calling pattern was consistent with drug trafficking. The duration of the calls was typically short, and the high

number of calls supported the affiants' belief that Appellee was a large-volume drug dealer with numerous contacts. (*Id.* at paragraph fifty-three).

¶ 10 Under another separate heading entitled "Need for Interception", the affiants certify that normal investigative techniques have been tried and have failed, appear unlikely to succeed if tried, or are too dangerous to employ. (*Id.* at paragraphs fifty-eight through sixty-five). The affiants analyze the use of confidential informants, undercover investigators, surveillance, search warrants, pen register and trap and trace devices, and an investigating grand jury as techniques which have either been already tried or not likely to succeed if tried. (*Id.*). They conclude that the issuance of the order authorizing interception of telephone conversations from Appellee's mobile telephone is necessary in order to "assemble the most complete prosecution possible against all involved...." (*Id.* at paragraph sixty-seven).

¶ 11 After the issuance of the August 6th order authorizing the interception of telephone conversations from Appellee's mobile telephone, the Commonwealth investigation proceeded. The investigators learned from the intercepted conversations that Appellee was sending an associate, co-defendant Todd Avigliano, to California to purchase six kilos of cocaine from one Marcus Rodriguez and to oversee the transport of the cocaine back to Pittsburgh. (Notes of Testimony, ("N.T."), Suppression Hearing, 9/19/03, at 7–12). California law enforcement officers sought and obtained a warrant at 12:15 p.m. on

September 6, 2001, to search Rodriguez' home and vehicles. Coordination between the two law enforcement entities was greatly enhanced by the continuous flow from Pennsylvania to California of information obtained through intercepted conversations from Appellee' mobile telephone. As a result, when an automobile driven by co-defendant Daniel Czura, bearing a Pennsylvania license tag, exited Rodriguez' garage at 6:30 p.m. on September 6th, the California authorities followed it for approximately five blocks and effected a stop. The subsequent search uncovered six kilos of cocaine located in a hollowed-out air bag compartment. (N.T., Suppression Hearing, 5/9/03, at 39–59). The search of Rodriguez' residence resulted in the seizure of a large sum of cash, two handguns, a semiautomatic rifle, a half-pound of methamphetamine, and drug paraphernalia. (*Id.* at 131).

¶ 12 On December 18, 2001, Czura and Avigliano were charged in Pennsylvania with possession of a controlled substance,[1] possession with intent to deliver,[2] and criminal conspiracy.[3] On March 6, 2002, Appellee was charged with the same three offenses in addition to criminal use of communication facility.[4]

¶ 13 Appellee, Avigliano, and Czura each filed a motion to suppress the physical evidence which had been seized in California. The trial court conducted hearings on the motions on February 5, 2003, May 9, 2003, and September 19, 2003. On March 11, 2004, the court entered the order at issue herein, in which it granted the motions to suppress all evidence seized from the residence of Marcus Rodriguez

---

**1.** 35 Pa.C.S.A. § 780–113(a)(16).

**2.** 35 Pa.C.S.A. § 780–113(a)(30).

**3.** 18 Pa.C.S.A. § 903(a).

**4.** 18 Pa.C.S.A. § 7512.

and from Czura's automobile.[5] The Commonwealth took a timely appeal and raises a single issue for our review as follows:

WHETHER THE SUPPRESSION COURT ERRED WHEN IT GRANTED [APPELLEES'] MOTION TO SUPPRESS EVIDENCE DERIVED FROM AN ORDER AUTHORIZING THE NONCONSENUAL INTERCEPTION OF COMMUNICATIONS ON THE GROUNDS THAT THE COMMONWEALTH FAILED TO ESTABLISH PROBABLE CAUSE TO BELIEVE THAT NORMAL INVESTIGATIVE PROCEDURES WITH RESPECT TO SUCH OFFENSE HAD BEEN TRIED AND FAILED OR REASONABLY APPEARED TO BE UNLIKELY TO SUCCEED IF TRIED OR WERE TOO DANGEROUS TO EMPLOY UNDER THE WIRETAPPING AND ELECTRONIC SURVEILLANCE CONTROL ACT.

(Commonwealth's Brief at 4).

¶ 14 Our review is guided by the following principles:

When the Commonwealth appeals from a suppression order, we follow a clearly defined standard of review and consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. The suppression court's findings of fact bind an appellate court if the record supports those findings. The suppression court's conclusions of law, however, are not binding on an appellate court, whose duty is to determine if the suppression court properly applied the law to the facts.

*Commonwealth v. Chernosky,* 874 A.2d 123, 124 (Pa.Super.2005) (*en banc*) (citations omitted).

¶ 15 Authorizations for interception of telephone communications are subject to the provisions of the Wiretapping and Electronic Surveillance Control Act, 18 Pa. C.S.A. §§ 5701–5782. An application for an order of authorization to intercept an electronic or wire communication must contain a sworn statement by the investigative or law enforcement officer who has knowledge of relevant information justifying the application, which statement must include "a particular statement of facts showing that other normal investigative procedures with respect to the offense have been tried and have failed, or reasonably appear to be unlikely to succeed if tried or are too dangerous to employ." *Id.* at § 5709(3)(vii). In addition, before a judge may issue an order authorizing an interception, the judge is required to determine on the basis of the facts submitted in the application that there is probable cause for belief that "normal investigative procedures with respect to such offense have been tried and have failed, or reasonably appear to be unlikely to succeed if tried or to be too dangerous to employ." *Id.* at § 5710(a)(3).

¶ 16 This Court has addressed the usage of normal investigative procedures requirement as follows:

which the trial court ordered suppression was the Commonwealth's failure to show that normal investigative procedures had been tried and had failed, or reasonably appeared to be unlikely to succeed if tried or were too dangerous to employ.

---

5. The trial court did conclude that the application contained probable cause to show that Appellee was trafficking in cocaine and was using the mobile phone number, 412–680–3729, for his illegal activity. (Trial Court Opinion, dated May 4, 2003, at 5 n. 1). As explained in the opinion, the basis upon

This is an objective standard; reliance cannot be placed solely upon a subjective belief by the Attorney General or District Attorney that normal investigative procedures will not likely succeed. In this aspect, it will be observed, the standard imposed by the Pennsylvania legislature is more stringent than the requirement imposed by Title III. It is designed to guarantee that wiretapping will not be resorted to in situations where traditional investigative techniques are adequate to expose crime. The requirement also suggests that a wiretap should not be employed as the initial step in a police investigation. However, the Commonwealth is not required to show that all other investigative methods have been exhausted. In making this determination, moreover, the issuing authority may consider and rely upon the opinions of police experts. In reviewing the adequacy of the application to support the issuance of an order of authorization, we will interpret the application in a common sense manner, not overly technical, with due deference to the findings of the issuing authority.

*Commonwealth v. Doty*, 345 Pa.Super. 374, 498 A.2d 870, 880–81 (1985) (citations omitted) (holding that affidavit which contains factual support for the opinion of the affiant, who was a specialist in vice and narcotics investigations, is sufficient to satisfy the use of normal investigative techniques requirement). *See also Commonwealth v. Vitale*, 445 Pa.Super. 43, 664 A.2d 999, 1004 (1995) (holding that Commonwealth's prior use of undercover infiltration, surveillance, execution of a search warrant, telephone records, and pen registers was

adequate demonstration of need for use of wiretap). The summoning of a grand jury is not a normal investigative technique. *Doty, supra* at 881.

██ ¶ 17 In the case *sub judice*, we conclude that the trial court erred in its conclusion that the Commonwealth had failed to demonstrate that normal investigative procedures had been tried and had failed, or reasonably appeared to be unlikely to succeed if tried or were too dangerous to employ. When read as a whole, the affidavit does provide probable cause to believe that normal investigative techniques had been sufficiently employed or would have been futile or overly dangerous. The facts recited, coupled with the expert opinions expressed by the affiants, constitute the requisite probable cause to support issuance of the order authorizing the interception.

¶ 18 The trial court viewed the ongoing investigation in an overly narrow manner by failing to consider the Commonwealth's prior use of confidential informants, surveillance, and pen registers and trap and trace devices.[6] Further, the trial court focused upon the opinions expressed by the affiants in the "Need for Interception" portion of the affidavit in isolation from the previous forty-three paragraphs which contained an exhaustive description of the Commonwealth's efforts to advance the investigation. Specifically, the Commonwealth was already using a confidential informant in direct dealings with Glenn Ford. In fact, on one occasion, Ford had correctly spotted a surveillance vehicle outside his residence. Use of a pen register and a trap and trace device showed that Appellee had numerous calls, nine

---

**6.** The trial court's assertion that pen registers and trap and trace devices were not tried on Appellee's phone line is factually inaccurate.

(Trial Court Opinion at 9). *See* discussion *supra* of paragraphs fifty-two through fifty-seven of the application.

hundred and eleven (911), of short duration between April 25 and July 20, 2001. Many of these calls were between California and Pennsylvania. Most significant, on July 30, 2001, Appellee told Ford that he had "bounced," or left the Pittsburgh area. Ford told a third party on July 31, 2001, that Appellee had left Pennsylvania to go to California. Pursuant to the pen register and trap and trace device authorized on July 31st, authorities learned that Appellee's mobile telephone was contacting cellular towers located in Nebraska, Utah, and California.

¶ 19 Appellee's departure from Allegheny County and his apparent presence in California is a uniquely compelling circumstance supporting the conclusion that normal investigative procedures reasonably appeared to be unlikely to succeed if tried. Appellee's absence rendered infeasible further surveillance, use of a confidential informant, or an attempt to convince Ford to act as an informant. The authorization of the interception of Appellee's mobile phone was singularly appropriate given the enormous difficulty which the Pennsylvania law enforcement team would have faced in attempting to determine Appellee's precise whereabouts absent such authorization.

¶ 20 In light of our disposition, we do not reach the Commonwealth's second argument that suppression is not an appropriate remedy for a violation of Section 5710(a)(3), pursuant to Section 5721.1(e), regarding exclusiveness of remedies and sanctions.

¶ 21 Based on our review of the record and the reasons set forth above, we conclude that the trial court erred in granting the motion to suppress the physical evidence seized in California. Accordingly, we reverse and remand for further proceedings.

¶ 22 Order reversed. Case remanded. Jurisdiction relinquished.

¶ 23 ORIE MELVIN, J. concurs in the result.

**J.F., Appellant,**